## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

STERLING CAPONE                                                    **PLAINTIFF**

v.                                    **NO.: 5:15-cv-05219-TLB**

UNIVERSITY OF ARKANSAS, et al.                           **DEFENDANTS**

### BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The undersigned submits this brief on behalf of the University of Arkansas and its Board of Trustees ("the University"), and in support of its *Summary Judgment Motion* filed herein.

## I.   UNDISPUTED MATERIAL FACTS

Defendants' motion and this brief rely upon the facts and exhibits contained in Defendants' *Motion*, the attached exhibits and the *Statement of Undisputed Facts*, filed herein.

## II.   LEGAL ANALYSIS

Viewing all evidence in the light most favorable to Capone, the University is entitled to summary judgment because: (A) Plaintiff failed to file a timely EEOC Charge; (B) her work environment was not actionable harassment; (C) her termination was not based on her gender; and (D) was not retaliatory.

## A.   FAILURE TO FILE TIMELY EEOC CHARGE.

Capone's claims are barred by her failure to file a timely EEOC charge. She alleged in her *First Amended Complaint* that her employment was terminated "[o]n or about November 21, 2014[,]" (D.E.# 26, ¶ 11); however, she certified in her EEOC Charge that the "latest" date that discrimination took place was November 28, 2014 (Ex. A, depo. ex. 29). In any event, the *Charge of Discrimination* that Capone filed with the EEOC establishes that she did not file it until June

12, 2015—196 days after November 28, 2014 (Ex. A, pp. 206-08 and depo. ex. 29). May 27, 2015, is the date that falls 180 days from November 28, 2014, and undisputed facts prove that Capone failed to meet that deadline.  Accordingly, Capone's claims are barred and must be dismissed. *Diaz v. Swift–Eckrich, Inc.*, 318 F.3d 796, 798 (8th Cir. 2003); *Curby v. Solutia, Inc.*, 351 F.3d 868, 873 (8th Cir. 2003); *Spears v. Mo. Dep't of Corr. & Human Servs.*, 210 F.3d 850, 853 (8th Cir. 2000); *Buckley v. Bd. of Trs.*, 780 F. Supp. 2d 827, 828 (E.D. Ark. 2011).

Throughout this lawsuit, Capone has never disputed that her EEOC Charge was untimely. She has instead argued that *Fed. Express Corp. v. Holowecki*, 552 U.S. 389 (2008), somehow requires the Court to ignore the date she finally filed her Charge and calculate her deadline using the date she filed her *Intake Questionnaire*: May 5, 2015.  The Court noted in *Holowecki* that the design of the intake questionnaire used in 2001 did "not give rise to the inference that the employee requests action against the employer" and urged the EEOC to "establish [] a clearer, more consistent process" to "reduce the risk of further misunderstandings." *Id.* at 405, 407. The EEOC did exactly that: "Since that time the EEOC has changed the form to require a claimant to clearly express his or her intent by checking one of two boxes," *Lugo-Young v. Courier Network, Inc.*, No. 10-CV-3197 RRM LB, 2012 WL 847381, at *6 (E.D.N.Y. Mar. 13, 2012), which "forces claimants to decide whether their questionnaire is a request for the agency to take remedial action, such that courts can objectively determine whether each questionnaire is a charge of discrimination or merely a request for further information," *Hawthorne v. Vatterott Educ. Ctrs., Inc.*, No. 09-CV-442-TCK-PJC, 2010 WL 3258560, at *4 (N.D. Okla. Aug. 17, 2010). Capone's reliance on *Holowecki* is misplaced because she had the benefit of the revised *Intake Questionnaire* which invited her to simply check a box if she wanted to file a charge, but she did not check it and her intake questionnaire fails to evince any intent to file a charge (Ex. A, depo. ex. 25, UA 24).

Capone's failure to check a box on her intake questionnaire cannot "reasonably be construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee," *Holowecki*, 552 U.S. at 402.  Accordingly, Capone never satisfied the "request-to-act" requirement necessary to meet the jurisdiction perquisites for filing a timely charge with the EEOC.

On May 8, 2015, the EEOC Investigator noted Capone's intent was uncertain and therefore did not treat her *Questionnaire* as a charge of discrimination (D.E. # 15- 2, PageID #85). The EEOC sent her a letter on May 15, 2015 in order to find out her intent.  It stated: "The information you gave us is not enough to determine how we should handle this case. More information is needed before we can continue."  (Ex. A, depo. ex. 26).  Capone was directed to contact the commission "as soon as possible because charges of employment discrimination must be filed with the time limits imposed by law."  *Id*.  Capone ignored this warning. According to the EEOC documentation previously submitted to this Court by Capone, she did not provide the EEOC with an interview until June 9, 2015.  Her Charge was received by the Commission on June 12, 2015 (D.E.# 15-2, PageID# 85-86). All of those events took place well beyond the statutory deadline of May 27, 2015. The earliest date the EEOC could have been aware of an intent to pursue a charge was June 9, 2015—still well past the federally mandated time limitation.

Pleas to excuse a complainant's federal obligation have *only* been granted by the Eighth Circuit where the charge is deficient due to the fault of the EEOC.  *See Schlueter v. Anheuser-Busch, Inc.*, 132 F.3d 455, 459 n. 4 (8th Cir. 1998); *Anderson v. Unisys Corp.*, 47 F.3d 302, 306-07 (8th Cir. 1995).  Those cases are distinguishable because there are no facts here to support a conclusion that the EEOC misled Capone. The forms are clear. They were created to prevent this very situation. The EEOC gave Capone ample opportunity to comply with the deadline, but she

still failed to do so.  She cannot blame the University either because it informed her of her right to contact the EEOC, at the very latest on April 2, 2015—almost *two months* before the May 27 deadline. The University even provided Capone the EEOC's address and toll-free number:

> **I must inform you that you have a right to consult with an attorney if you choose to do so.  In addition, you may contact the local Equal Employment Opportunity Commission at 820 Louisiana, Ste. 200, Little Rock, Arkansas, 72201, #501-324-5991 04 # 1-800-669-4000.**

(Ex. A, pp. 182-84 and depo. ex. 23). Capone testified she received this email on either April 2nd or 4th (Ex. A, p. 182).  Further, the University's "Federal EEO is the Law" poster that informs employees how to report harassment or discrimination to the EEOC was posted at Razorback Transit throughout Capone's entire employment (Ex. E, ¶ 12 and E-3, UA 848-44; Ex. F, ¶ 7; Ex. G, ¶ 6; Ex. H, ¶ 10; Ex. I, ¶ 8; Ex. K, ¶ 7). The University's posters also notify its employees that there are "strict time limits for filing charges" and includes a toll free number and website address for reporting (Ex. E-3, UA 848, 844). Moreover, Capone knew when she met with her attorney that she had not yet filed a charge with the EEOC (Ex. A, p. 184). She admitted, and her exhibits confirm, that she was not only represented by counsel when she failed to mark the box that specifically requested the EEOC to take remedial actions, but that her attorney was the one who mailed in the form (Ex. A, pp. 186-88 and depo. ex. 24, UA 252, and depo. ex 24, UA 24). As a matter of law, Capone's claims are barred.

**B.    PLAINTIFF'S WORK ENVIRONMENT WAS NOT HOSTILE**

Capone's workplace was not an actionable hostile work environment.  To establish such claim, Capone must prove that she belongs to a protected group; was subjected to unwelcome harassment; based on sex; affected a term, condition, or privilege of employment; and that the University knew or should have known of the harassment and failed to take proper remedial action. *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016). Capone's claim should be dismissed

because the conduct she identified as harassment was: (1) not "unwelcome" as a matter of law; (2) did not affect her employment, and (3) was remediated once known to the University.

> ### 1.    <u>Behavior Identified by Plaintiff Was Not Unwelcome Conduct.</u>

A plaintiff cannot establish that she experienced unwelcome harassment if she fails to complain about the alleged incident in a timely manner.  *See Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 632 (8th Cir. 2000). Capone did not complain about the text messages she received from Stinchcomb as they occurred, and only ever reported them after she was fired.  She did not complain or otherwise indicate disapproval to Stinchcomb or another supervisor at Razorback Transit at any time during her employment.  She did not do this because she thought Stinchcomb was on the hiring committee or would schedule her for fewer hours (Ex. A, pp. 134, 217 and depo. exs. 25 & 28; Ex. B, p. 45). However, fear of retaliation is not a proper excuse for an employee's failure to report sexual harassment.  *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 422 (8th Cir. 2010).  Although an employee can be excused for a delay in reporting harassment if the employee can demonstrate a truly credible threat of retaliation, *id*, Capone has no evidence that such threat existed.  Capone consensually participated in the messaging with Stinchcomb from July 2014 through the end of her employment in November 2014—approximately four (4) months (D.E.# 26, ¶ 19). The report she claims to have made to Colbert-Diaz on November 21, however, was the first time Capone ever indicated that Stinchcomb's messages were unwelcome. Moreover, when Capone was directly asked in her deposition, "Did you ever tell Stinchcomb to stop sending you text messages?" she testified:

> I asked Shawn what I should do, and I tried not to offend Mr. Stinchcomb -- or I didn't encourage him and I didn't -- I tried to get away from it.  Meaning when he said, 'Oh, I'd 69 you,' I walked away.  When he told me to take off my jacket and said, 'Whoa,' I just turned around (Ex. A, p. 216).

Capone admits she never made it clear to Stinchcomb that his texts were unwelcome, or responded, "Stop texting me" (Ex. A, p. 216). The proper inquiry as to whether an individual considers behavior to be "unwelcome" is whether he or she indicates as such through his or her own conduct. *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 966 (8th Cir. 1999). Capone's own conduct indicates that Stinchcomb's was not unwelcome. *See Meshell v. City of El Dorado*, No. 1:15-CV-1017, 2017 WL 277573, at *6 (W.D. Ark. Jan. 20, 2017), *jmt. entered*, No. 1:15-CV-1017, 2017 WL 277572 (W.D. Ark. Jan. 20, 2017); *Stuart*, 217 F.3d at 632 (retroactive complaints alone are insufficient to establish past unwelcome harassment); *Pimentel v. St. Louis Pub. Sch.*, No. 4:08-cv-1477 TIA, 2011 WL 128788, at *12 (E.D. Mo. Jan. 14, 2011) (plaintiff's sole complaint insufficient to show unwelcome harassment during eight months prior to her complaint). Thus, the element of "unwelcome" harassment is lacking and dismissal is appropriate.

### 2.    Behavior Identified by Plaintiff Did Not Affect Her Employment

A work environment is not actionably hostile unless there are "[m]ore than a few isolated incidents" "so intimidating, offensive, or hostile that it poisoned the work environment." *LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005). It takes more than "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" to amount to a hostile work environment. *Id*. Indeed, the Supreme "Court implores lower courts to apply the demanding harassment standards to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id*. The conduct must be extreme, not just rude or unpleasant. *Id*. at 1057. Hostile-work-environment claims are based on the totality of the circumstances, frequency and severity of the conduct, whether it was physically threatening or humiliating (as opposed to mere offensive utterances) and whether it unreasonably interfered with work performance. *Id*.

Assuming every incident identified by Capone actually occurred; the conduct cannot reasonably be characterized as frequent, severe, threatening or extreme.   They occurred sporadically over an eight-month period.  Other female bus drivers who worked with Capone every day never heard anyone call her a "dumb blonde" (Ex. I, ¶ 5); make a "69" comment (Ex. H, ¶ 8); say anything of a sexual nature or inappropriate to or about Capone or proposition her (Ex. G, ¶ 3; Ex. I, ¶ 4); or hear anybody say anything bad about Capone or about any other female bus driver (Ex. H, ¶ 8).  These women heard co-workers cuss and tell jokes, but that they were not offensive to them as women (Ex. H, ¶ 8; Ex. I, ¶ 4). Assuming also that Capone did not get a uniform shirt that fit her or was not allowed to wear one from home, it was not because of her gender because McCawley, Lopeman and Addington all had shirts that fit them or were allowed to wear one of their own from home (Ex. G, ¶ 7; Ex. H, ¶ 5; Ex. I, ¶ 7).  These women heard employees at Razorback Transit call Capone "jiggly", but explain that it was only because she once said her mirror was "jiggly" over the radio, everyone heard it and thought her comment was funny (Ex. G, ¶ 4; Ex. H, ¶ 6).  McCawley said it had absolutely nothing to do with the fact that Capone was a woman or had large breasts, and McCawley never heard anybody say that other than in this lawsuit (Ex. H, ¶ 6). Capone, herself, admits that that the Transit employee that she thought called her "snatch", has a Scottish accent and was actually trying to say "snitch" and it only sounded like "snatch" because of his accent (Ex. A, p. 259).  As a matter of law, none of the incidents identified by Capone (altogether or taken separately) rise to the level of an actionable hostile work environment because "[s]poradic use of abusive language, gender-related jokes, and occasional teasing are the ordinary tribulations of the workplace, and as such, [] do not amount to actionable harassment." *Erenberg v. Methodist Hosp.*, 357 F.3d 787 (8th Cir. 2004); *Scusa*, 181 F.3d at 969.

Text messages from Stinchcomb, likewise, do not subject the University to liability. Capone testified she did not report him or tell him to stop because she thought he was on the hiring committee or would schedule her for fewer hours (Ex. A, pp. 134, 217 and depo. exs. 25 & 28). Receiving work assignments not commensurate with abilities and being a denied a timely promotion does not rise to an adverse employment action. *Jacob-Mua,* 289 F.3d at 522. Negative evaluations, inconvenient scheduling and reassignment are also insufficient. *See Henthorn*, 359 F.3d at 1028. Stinchcomb was not even on Capone's hiring committee (Ex. O, p. 115), and none of the conduct attributed to him was physically threatening or humiliating. It certainly did not "unreasonably interfere" with Capone's work performance because she claims she was "such a good driver" and that she was the best candidate for an appointed position (Ex. A, p. 40).

Compared to other cases where the Supreme Court and the Eighth Circuit determined there was no sexual harassment, the incidents alleged by Capone are clearly not actionable.[1] For instance, *LeGrand*, *supra*, the court addressed a case where the plaintiff claimed his supervisor asked him to watch pornographic movies and masturbate with him. 394 F.3d at 1100. The

---

[1] *See, e.g., Duncan v. Gen. Motors Corp.,* 300 F.3d 928, 931-35 (8th Cir. 2002) (not actionable where employee was propositioned; improper touching on multiple occasions occurred; a request to sketch a sexually objectionable planter; harasser had penis-shaped pacifier in his office and a computer screen saver of a naked woman); *Tuggle v. Mangan*, 348 F.3d 714, 722 (8th Cir. 2003) (not "actionable conduct" where a co-worker made a number of comments based on the plaintiff's sex and posted a photograph showing the plaintiff's "clothed rear end"); *Ottman v. City of Independence,* 341 F.3d 751, 760 (8th Cir. 2003) (district court erred in finding a triable issue for the jury where the conduct consisted of belittling and sexist remarks on almost a daily basis); *Alagna v. Smithville R-II Sch. Dist.,* 324 F.3d 975, 980 (8th Cir. 2003) (inappropriate conduct toward co-worker over two years, which included touching, commenting on appearance, saying "I love you," exhibiting a demeanor of a sexual nature, invading personal space, calling many times at home, and giving two romance novels and another gift, not sufficiently severe or pervasive); *Henthorn v. Capitol Comm's, Inc.*, 359 F.3d 1021 (8th Cir. 2004) (supervisor's repeated requests that employee go out with him and calling her on two occasions late at night were inappropriate, immature, and unprofessional, but did not support a claim of sexual harassment or hostile work environment).

supervisor admitted he hugged and kissed the plaintiff and brushed the plaintiff's crotch with the back of his hand. *Id.* at 1101. The plaintiff also alleged that his employer "kissed [the plaintiff] in the mouth;" grabbed the plaintiff's buttocks; and "reached for [the plaintiffs] genitals." *Id*. While the court found the harassment to be "crass to churlish" and "manifestly inappropriate," it held the incidents, which occurred over a nine-month period (longer than that alleged by Capone), were not so severe or pervasive as to poison the employee's work environment. *Id*. at 1102-03. Special mention was made of the fact that, like Capone's allegations, the incidents were not physically violent or overtly threatening, and plaintiff did not immediately complain about them. *Id*. at 1100.

In Capone's situation, there were only a handful of incidents that allegedly occurred over a period of five months. During this time, Capone mostly drove a bus with strangers, not with her co-workers or supervisors. After her shift was over, she was instructed to leave. The conduct she identified was not physically violent or overtly threatening and did not affect her employment or her ability to do her job. If the incidents recounted by her are true, they may demonstrate rude and unprofessional conduct by her colleagues, but they are not, as a matter of law, a basis for a lawsuit.

### 3. Insufficient Knowledge of Claimed Harassment and Proper Remedial Action Taken

Capone does not identify any tangible employment action taken against her other than her termination by Waddell. This precludes liability as against the University. Although "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee[,]"[2] "[w]hen no tangible employment action is taken, a defending employer may raise

---

[2] Stinchcomb and Stevens were *not* "supervisors" for the purposes of determining vicarious liability for an actionable hostile environment claim. "[T]o be considered a supervisor, 'the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different

an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence[.]" *Todd v. Ortho Biotech, Inc.*, 175 F.3d 595, 597 (8th Cir. 1999).  The undisputed facts leave no doubt that no employee's alleged harassing conduct culminated "in a tangible employment action such as discharge, demotion, or undesirable reassignment" against Capone. *See Phillips v. Taco Bell Corp.*, 156 F.3d 884, 889 n.6 (8th Cir. 1998).  No one demoted her, and she did not quit because of anyone's conduct.  She was terminated by Waddell (Ex. C, ¶ 21). Stinchcomb played no role in her termination and does not even know what went into the decision (Ex. O, p. 101).  He testified he would have preferred she was not terminated because he was short bus drivers and would have assigned her a bus route that week (Ex. A, pp. 151-52; Ex. O, p. 101).

Regardless, the University is entitled to the *Ellerth-Faragher* defense which defeats employees' claims that their supervisors created a hostile work environment because: (a) "the [University] exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "[Capone] unreasonably failed to take advantage of any preventive or corrective opportunities provided by the [University] or to avoid harm otherwise." *Todd*, 175 F.3d at 597.

For the first prong, the undisputed facts establish that the University exercised reasonable care to prevent and correct promptly any sexually harassing behavior.  It did exactly what an employer is supposed to do in this situation—It previously created a reasonable policy governing sexual harassment and created a reporting mechanism that was in place throughout Capone's employment (Ex-1, UA 864).  The policy, as well as the EEOC's federal reporting information, was conspicuously posted in Capone's workplace and available to her online throughout her

---

duties.'" *Merritt v. Albemarle Corp.*, 496 F.3d 880, 883–84 (8th Cir. 2007).  That an alleged harasser may have been a "team leader" with the authority "to assign employees to particular tasks" will not be enough to make that person a supervisor. *Id*; *Weyers v. Lear Operations Corp.,* 359 F.3d 1049, 1057 (8th Cir. 2004).

employment (Ex. E, ¶ 12 and E-3, UA 848-44; Ex. F, ¶ 7; Ex. G, ¶ 6; Ex. H, ¶ 10; Ex. I, ¶ 8; Ex. K, ¶ 7). The University conducted sexual harassment training that informed Capone and all of her co-workers about the conduct that would violate the University's policy and how and where to report it (Exs. E, ¶ 12-14, E-3 and E-4, UA 798, 800, 804-42; Ex. F, ¶ 7; Ex. H, ¶ 10; Ex. K, ¶ 7). Capone still never reported Hill (Ex. A, pp. 22, 25), and she did not identify Stinchcomb as the supervisor who was sending her inappropriate texts until after Waddell made the decision to terminate her employment (Ex. A, pp. 128, 134). The University still promptly appointed a fact-finder in both instances who thoroughly investigated all of Capone's allegations (Ex. A, pp. 19, 22, 25 and depo. ex. 1 and 30), and even terminated the alleged offenders (Ex. C, ¶ 30). This was textbook execution of *Ellerth-Faragher*'s initial prong.

Like the first, the second prong is also founded on undisputed facts as Capone "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the [University] or to avoid harm otherwise." *Id.* "[A]n employee's failure to use the employer's complaint procedure will normally satisfy the employer's burden regarding the second element of the affirmative defense[.]" *Jackson v. Ark. Dep't of Educ., Vocational & Tech. Educ. Div.*, 272 F.3d 1020, 1026 (8th Cir. 2001). The University's harassment policy directs faculty and staff to report discrimination and harassment to UA-OEOC. It is beyond genuine dispute that Capone never did this (Ex. A, pp. 128, 134 and depo. exs. 15 & 16; Ex. B, p. 54; Ex. N. pp. 133-34). Other than the incident with Hill, it is also undisputed that Capone never reported any type of harassment to UA-OEOC or UA-HR until after she was fired. Even though Capone met with Haupt at the UA-OEOC in June, attended harassment training in August, filed a harassment complaint with the UAPD against a passenger in September, met with Colbert-Diaz at UA-OEOC in November, was interviewed by Batiste in December (and sent her numerous emails), and met with the EEOC

investigator in May, no one, including Capone, ever documented that she told Waddell during her employment about any incidents for which she is now claiming as the basis for her lawsuit.  In fact, all documentation in this matter reflects the opposite (Ex. A, pp. 128, 134 and depo. exs. 15, 16, 25 & 30; Ex. E-2; Ex. L-1). Capone clearly failed to utilize the preventative and corrective measures provided by the University in a prompt manner.

*Gordon v. Shafer Contracting Co.*, 469 F.3d 1191 (8th Cir. 2006) leaves no doubt that the University satisfied both prongs of *Ellerth-Faragher*. In *Gordon*, the Court affirmed summary judgment for an employer who (like the University) had antidiscrimination policies and reporting procedures; the employer was being sued by an employee who (like Capone) did not take advantage of these policies because he thought they would be ineffective.  In that case, the employer (like the University) published an employee policy that described its antidiscrimination policies and reporting procedures, including a policy against harassment.  *Id.* at 1195.  That policy (similar to the University's) was available to all employees and identified officials to whom harassment could be reported, as well as their contact information. *Id.*  The employee in that case failed to ever report the alleged harassment to any of those officials, *see id*., just as Capone similarly failed to report Stinchcomb's behavior until after she had already been terminated. The employee in *Gordon*, like Capone, claimed he failed to report the alleged harassment because he believed reporting would be ineffective.  *Id.*  But, just as that employee's "bare assertions are insufficient to avoid summary judgment[,]" so too are Capone's. *Id.*

**C.**    **NO GENDER DISCRIMINATION**

Capone cannot establish (1) a *prima facie* case; (2) pretext; or (3) that gender was a motivating factor in this lawsuit.

**1.    No Prima Facie Case of Gender Discrimination**

Here, Capone must show that male employees engaged in the same or similar conduct that she was terminated for, but were not discharged. *Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009).  Capone cannot meet her burden here because she was not similarly situated to any male bus drivers a Razorback Transit.  She was not a full-time appointed employee; she was an extra-help hourly bus driver. No male bus driver, part-time or full-time, engaged in the same conduct as Capone.  Groom, one of Capone's former supervisors who has not been accused of anything by her, could not recall any male bus driver at Razorback Transit who repeatedly stayed on the clock later than their assigned shift or in the maintenance shop, without authorization, as often or as long as Capone, after being told not to do so by a supervisor (Ex. P, ¶ 8). No male extra-help, hourly bus driver was as disruptive to the workplace environment as Capone; or repeatedly violated policies necessary to efficiently and safely operate Razorback Transit to the same extent as Capone (Ex. C, ¶ 21).  Certainly, not without being terminated.

Typically, when other Razorback Transit employees received their first notice of an infraction such as violation of Policy 732.0, they would not repeat the offense *(*Ex. C, ¶¶ 4, 24). No male extra-help, hourly bus driver's misconduct necessitated a full criminal investigation as Capone's did, either (Ex. C, ¶ 20). Even Stevens is distinguishable from Capone in that he was not an extra-help, hourly bus driver; he was a full-time, appointed mechanic. He largely performed his duties as expected beyond the complaints Capone levied against him for activities which she excuses because they occurred outside of the workplace. No male extra-help, hourly bus driver had a written complaint made against them by another employee for being in the maintenance area (Ex. B, p. 82). No male extra-help, hourly bus driver ever had a written request made by a mechanic that he not be allowed to be around the mechanic in the maintenance area (Ex. B, pp. 82-83). No male bus driver had a UA-OEOC complaint filed against him except Hill, and he was terminated

just like Capone (Ex. B, pp. 83-84; Ex. C, ¶ 30).

Only Capone had criminal complaints filed against her by one of the mechanics in the maintenance shop (Ex. A, pp. 218-20). Only Capone had multiple complaints and documented violations of policy communicated to Waddell by several different supervisors. No other extra-help, hourly bus driver violated the overtime policy and time clock procedures as often or for as long a period of time as Capone (Ex. K-1; Ex. C, ¶ 21). In fact, Mitchell, who oversees the time clock system, states that she cannot recall there ever being another employee at Razorback Transit, male or female, who claimed the amount of unauthorized overtime that Capone did or that was terminated for that reason (Ex. K, ¶ 5). Dunn, likewise, cannot recall any male bus drivers who did anything more than have a conversation with a mechanic for "10 to 15 minutes" and then move on (Ex. D, pp. 54-55). He is not aware of anybody, except Capone, who was disciplined, written-up "or anything" for being in the maintenance shop (Ex. D, p. 29). With all inferences in Capone's favor, there may be a male bus driver who received or should have received some counseling or warning for less egregious behavior, dissimilar misconduct or a workplace rules violation, but no one engaged in the same or similar collective misconduct as Capone who was not fired.

## 2.    **Plaintiff Terminated for Legitimate Non-Discriminatory Reason**

Even if Capone made a *prima facie* case, the University is entitled to dismissal of her discrimination claim because Waddell articulated a legitimate, nondiscriminatory reason for terminating her employment. "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. Mo. Dept. of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999). Waddell has consistently stated that Capone was terminated for her repeated refusal to adhere to the department's time clock and maintenance shop policies and procedures after continually being told

to follow them, which interfered with the work of others and escalated into disruption of Transit operations (Ex. C, ¶ 21). This position is corroborated by nearly all Capone's former co-workers, including five women and her current live-in business partner, Stevens.

Capone now has the burden to show a genuine issue of material fact that Waddell's reason is merely a pretext for gender discrimination, and she maintains this burden of persuasion at all times. *Bone v. G4S Youth Svs., LLC.,* 686 F.3d 948, 955 (8th Cir. 2012). Her burden "merges with the ultimate burden of persuading the court that [she was] the victim of intentional discrimination," and it is "heavy". *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002). Capone disputes that she ever did anything wrong, but the key question here is not whether she actually did (even though the documentary evidence confirms this), but whether Waddell as the decision maker reasonably believed that she committed the violations. *See McCullough v. UAMS*, 559 F.3d 855, 861 (8th Cir. 2009). The Eighth Circuit has repeatedly held that the truth of the allegations in discrimination cases is inconsequential to the determination of pretext. *Id. Macias Soto v. Core-Mark Intern., Inc.*, 521 F.3d 837, 842 (8th Cir. 2008); *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004); *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000). "A plaintiff seeking to survive an employer's motion for summary judgment must therefore show a genuine issue for trial about whether the employer acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct justifying termination." *Id.*

Capone denies she violated any policy, much less knew about them, but she cannot dispute that Dunn, Groom, Stinchcomb and Stevens informed Waddell that she did (Ex. B, p. 82; Ex. C, ¶¶ 10, 12, 14, 18; Ex. D, pp. 16; Ex. E, ¶ 6 and E-2, UA 166; Ex. P, ¶¶ 4-6). There is no evidence to rebut the fact that Dunn reported the November 3rd incident involving Capone to Waddell, or that Dunn provided a written statement to Waddell regarding the matter (Ex. C, ¶ 14). There is no

evidence disputing that Groom informed Waddell that Capone was frequently in the maintenance area beyond her scheduled shift or that Groom gave Waddell two "Notes to the File" that documented these continued policy violations (Ex. C, ¶¶ 10, 18; Ex. P, ¶¶ 4-6).  Capone denies she harassed Stevens, but she cannot deny that he reported he was being harassed by her to Dunn, Waddell, the UA-OEOC and UAPD (Ex. B, p. 82; Ex. C, ¶¶ 20-21; Ex. E, ¶ 6 and E-2, UA 166). Waddell had absolutely no reason to doubt the veracity of these reports or question whether they were motivated by discrimination.  In fact, he also witnessed Capone being in the maintenance shop and was aware of the criminal complaints against her (Ex. C, ¶¶ 16, 20).

Capone may claim that the evidence against her was circumstantial, not credible or did not rise to gross misconduct, but all of these protests are irrelevant to the summary judgment analysis in Title VII lawsuits.  Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.), *cert. denied*, 528 U.S. 818 (1999).  The argument that Capone's behavior was not serious enough to warrant termination or that a proper investigation was not conducted merely questions the soundness of Waddell's judgment—it does not demonstrate gender animus or pretext.  *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994).  In fact, the Supreme Court has held that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).  "An employee's attempt to prove pretext or actual discrimination requires more substantial evidence [than it takes to make a prima facie case], however, because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification.  *Id.*

A plaintiff has a heavy burden to meet in proving pretext when defending a motion for

summary judgment. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002). To carry this burden, Capone must "produce specific, tangible evidence showing a disparity in the treatment of similarly situated employees." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 882-883 (8th Cir. 2005). Although the "similarly situated" standard at the *prima facie* stage is a "low threshold," requiring only that the employees are "involved in or accused of the same or similar conduct and are disciplined in different ways," *id*, the test for determining whether an employee is similarly situated at this stage is still "*rigorous*." *EEOC v. Kohler Co.*, 335 F .3d 766, 775 (8th Cir. 2003). Capone must demonstrate that the comparators are similarly situated "*in all relevant respects*," meaning that the comparators must have "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without mitigating or distinguishing circumstances." *Marquez v. Bridgestone Firestone, Inc.*, 353 F.3d 1037, 1038 (8th Cir. 2004). Capone cannot present "substantial evidence", much less any evidence, to overcome this burden, and there is no evidence to support the inference that her termination was a ruse concocted by Waddell to hide his discriminatory animus for women.

### 3.  Waddell Did Not Terminate Capone Because She is a Woman

There is no evidence that Capone's gender motivated Waddell to terminate her. Throughout the analysis, the ultimate burden remains with Capone to show she was terminated because of her gender. *McDonnell Douglas*, 411 U.S. at 804; *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007). Capone must show "both that [Waddell's proffered] reason was false, and that discrimination was the real reason." *Hicks*, 509 U.S. at 515. "It is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id*. at 519. There is no evidence to support the reasonable belief that Capone was fired from the University because she is a woman. Waddell relied upon his own observations and

information from Dunn, Groom, Mitchell, and even Capone's live-in partner, Stevens, in making a decision that was compelled by the circumstances she, herself, created (Ex. C, ¶¶ 10, 14, 18, 20-21). UAPD police reports reflect that information in the reports were shared with Waddell (Ex. C, ¶¶ 20-21; Ex. J-2). He called McLoud for advice in dealing with Capone's violations on separate occasions (Ex. C, ¶ 4; Ex. M, pp. 6-8, 10-11, 14). Based on all this information, Waddell terminated Capone's employment.  Under the circumstances, it was certainly reasonable for him to do so.

Although Capone was interviewed during UA-OEOC's investigation of Hill early in her employment, she never alleged during her employment that Waddell, Dunn, Groom or Stinchcomb discriminated against her, harassed her or had some other reason to want her fired.  She never filed a claim with UA-OEOC or the EEOC alleging gender discrimination or harassment during her employment, and even after, she never alleged that Waddle, Groom or Dunn did it. Further, Capone's misconduct was corroborated by other female employees at Razorback Transit (Ex. F, ¶ 2; Ex. G, ¶ 7; Ex. H, ¶ 9; Ex. I, ¶ 2; Ex. K, ¶ 3).  McCawley, Lopeman, Addington, Mitchell and McLeroy are all women who worked with Capone and had the opportunity to observe her conduct. All stated they have never seen anything that would lead them to believe Capone was treated differently because she is a woman; heard Capone make any complaint about discrimination, harassment or retaliation; or seen, heard or experienced anything that would lead them to believe that Waddell treats women less favorably than men (Ex. F, ¶¶ 3, 4; Ex. G, ¶¶ 2-3, 5; Ex. H, ¶¶ 5, 7, 9; Ex. I, ¶ 3, 6; Ex. K, ¶ 6).  Capone has not identified any witness that will testify that Waddell disparaged women or generally treats them worse than male employees.  It defies logic that five of Capone's co-workers, plus McLoud, Colbert-Diaz and Batiste (all women), would collectively conspire with Waddell to discriminate against Capone based on her gender.  This is especially true where there is no evidence that Waddell otherwise discriminates against women, and there is no

evidence of discriminatory comments or action against women attributable to Waddell, Dunn or Groom, and even Stichncomb (the employee Capone accused of harassing her) testified that he would have preferred that she was not dismissed (Ex. O, p. 101).  There is no evidence that women are disciplined or terminated more than men at Razorback Transit; that Waddell has a history of discriminating against women; or that women have filed complaints against Waddell. Although ten depositions have been taken, and nearly every witness in this case has either testified or provided a declaration, there was not a single mention of Capone's gender ever being a remote consideration in her treatment or termination by Waddell.  Evidence of gender discrimination in this case is not simply exiguous, it is nonexistent.

**D.    NO RETALIATION**

For her retaliation claim, Capone must show that she engaged in protected conduct and suffered a materially adverse employment action that was causally linked to the protected conduct. *McDonald v. City of St. Paul*, 679 F.3d 698, 707 (8th Cir. 2012). If the she succeeds in establishing a prima facie case, the University may rebut this claim by advancing a legitimate, non-retaliatory reason for her termination. *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011). Capone must then show that the given reasons are only a pretext. *Id*. Capone's retaliation claim fails for four reasons: (1) her non-specific claims did not constitute a protected activity; (2) there is no causal connection between her involvement with any complaint she claims she made and her termination; (3) Waddell already terminated Capone for misconduct before she reported Stinchcomb; and (4) she was terminated for a legitimate and nondiscriminatory reason.

**1.    Complaints of Inappropriate Behavior are Not Protected Activities.**

Capone cannot make a prima facie case by relying on her vague complaints about unprotected activity.  She claims she made complaints to Waddell once in August, twice in

September, once in October and then on November 20 (Ex. A, pp. 157-169, 201-02, 243-44). The Eighth Circuit has noted that the participation clause under Title VII "protects only participation 'under this subchapter,' so filing an internal complaint or participating in an employer's internal complaint procedures that are independent of the 'subchapter,' i.e., not pursuant to an investigation by the EEOC or its designee, is not covered." *Gilooly v. Mo. Dept. of Health and Senior Serv's*, 421 F.3d 734 (8th Cir. 2005) (concurrence)(*citing Vasconcelos v. Meese*, 907 F.2d 111, 113 (9th Cir. 1990)); *see also Brower v. Runyon*, 178 F.3d 1002, 1006 (8th Cir. 1999). The purpose of the participation clause "is to protect the employee who utilizes the tools provided by Congress to protect [her] rights." *Vasconcelos*, 907 F.2d at 113. Accusations made before the Commission are protected by statute; charges made outside of that are at the accuser's peril. *Id*. Capone never engaged in protected activity under the participation clause during her employment.

Title VII also provides that an employer may not discriminate against an employee on the basis that the employee has opposed any practice made an unlawful employment practice. 29 U.S.C. § 623(d). To demonstrate the presence of protected opposition, a plaintiff must show a good faith reasonable belief that his employer engaged in a discriminatory employment practice. *Evans v. Kansas City, Mo. Sch. Dist.*, 65 F.3d 98, 101 (8th Cir. 1995). Capone is required to demonstrate that she complained about gender discrimination, not simply unfair treatment. *E.g. Genosky v. Minn., et al*, 244 F.3d 989, 993 (8th Cir. 2001); *Brower*, 178 F.3d at 1005. Although Capone claims she complained to Waddell about various things she did not like, she never attributed any of her gripes to discrimination while she was employed, and no other female employee in her department corroborates her latest subjective belief that she was the victim of gender discrimination. Capone was not, therefore, engaged in a protected activity for the purposes of Title VII. *See Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028-29 (8th Cir. 2002).

Further, an employee cannot merely show that she subjectively believed her employer was engaged in unlawful employment practices, she must demonstrate that her belief was objectively reasonable in light of the facts and record presented. *Bonn v. City of Omaha*, 623 F.3d 587, 591 (8th Cir. 2010). The reasoning of this case is consistent with the Supreme Court's decision regarding this issue in *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001). In *Breeden*, the plaintiff's supervisor read aloud from a personnel file that one employee had once commented to a co-worker, "I hear making love to you is like making love to the Grand Canyon." *Id.* at 269. After the plaintiff complained about the reading of this statement, she alleged she was punished for her complaints. The Court concluded the plaintiff's complaints were protected under Title VII because they were made with a reasonable, good faith belief that they constituted unlawful harassment. The Supreme Court reversed the Ninth Circuit. *Id.* at 270. It based its decision on the fact that "offhand comments, and isolated incidents (unless extremely serious) will not amount" to sexual harassment. *Id.* at 271. Similarly, no reasonable employee would have viewed the factual incidents recounted by Capone as actionable discrimination, harassment or retaliation. She was allegedly subjected to rude and unprofessional behavior, but this does not demonstrate an "objectively reasonable" belief that the University engaged in unlawful employment practices.

## 2. **No Causal Connection**

Capone cannot make a prima facie case by pointing to UA-OEOC's conclusion that Hill violated University policy. It is undisputed that Capone did not report Hill (Ex. A, p. 25). And there is no evidence that Waddell possessed any desire to fire Capone for participating in this investigation. Although she participated in the investigation of Hill in June of 2014 regarding Hill's inappropriate behavior, there is no causal connection between her involvement there and Waddell's decision to terminate her employment for violating the maintenance shop and time clock

policies five months later on November 20, 2014. The University fully investigated the Hill matter and he was terminated for his misconduct (Ex. C, ¶ 30).  Capone suffered no disciplinary or other adverse employment action as a result (Ex. A, p. 164).  The nexus between her termination and the "vague" complaints she claims she made in August, September and October about inappropriate texts, jokes and comments is lacking here.

Although "[a]n inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events," generally "more than a temporal connection is required to present a genuine factual issue on retaliation." *Peterson v. Scott Cnty.*, 406 F.3d 515, 524 (8th Cir. 2005). As a matter of law, a one-month gap is too long to support the inference of retaliation standing alone.  *Nelson v. J.C. Penney Co.,* 75 F.3d 343, 346-47 (8th Cir. 1996), *cert. denied,* 519 U.S. 813 (1996); *Brown v. City of Jacksonville*, 4:10CV001637 JMM, 2012 WL 604218 (E.D. Ark. Feb. 24, 2012). In order to even "raise the inference of a causal connection" in the first place, the alleged retaliatory action must be "sufficiently contemporaneous to the protected activity."  *Littleton v. Pilot Travel Centers*, *LLC,* 568 F.3d 641, 642 (8th Cir. 2008). "[G]iven a delay of sufficient length, the 'causal nexus tends to evaporate.'" *Stewart v. Indpt. Sch.*, 481 F.3d 1034, 1044 (8th Cir. 2007).

Moreover, even assuming that a causal inference that could somehow be drawn from this period it would be destroyed by reports that Capone had not been clocking in early and out late without authorization and spending too much time in the maintenance shop.  It is undisputed that Dunn, Groom, Stinchcomb, and Stevens informed Waddell that she engaged in that misconduct (Ex. C, ¶¶ 10, 12, 14, 18).  Numerous decisions by our Circuit Court make clear that, as a matter of law, this undisputed evidence extinguishes any causal connection between Capone's report concerning Hill and her termination. "Evidence that the employer had been concerned about a

problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Smith v. Allen Health Sys.*, 302 F.3d 827, 834 (8th Cir. 2002).  To be sure, "the presence of intervening events undermines any causal inference that a reasonable person might otherwise have drawn from temporal proximity." *Freeman v. Ace Telephone Ass'n*, 467 F.3d 695, 698 (8th Cir. 2006).  *See also Grey v. City of Oak Grove*, 396 F.3d 1031, 1034-35 (8th Cir. 2005) (summary judgment granted on plaintiff's retaliation claim; decision was reinforced by plaintiff's violation of employment policies during the gap in time); *Calder v. TCI Cablevison of Mo., Inc.* 298 F.3d 723, 726-28 (8th Cir. 2002); *Horrocks v. Mech. Breakdown Protection, Inc.*, 32 Fed. Appx. 159, 2002 WL 362938, at *1 (8th Cir. 2002). Accordingly, any causal connection that may be inferred from the temporal proximity between Capone's participation in the Hill investigation in June, her vague complaints to Waddell in August, September, October, and November, and her termination was severed by reports of her misconduct.

### 3.      Termination Decision Made Before Conduct was Reported

Capone must show that Waddell, the decision-maker, knew about her protected activity. *See Robinson v. Potter*, 453 F.3d 990, 994 (8th Cir. 2006).  There is no evidence to dispute that the decision to eliminate Capone's position was made prior to Capone's alleged report of Stinchcomb's conduct on November 21, (Ex. A, pp. 124-25; Ex. C, ¶ 21; Ex. M, p. 56), or that Waddell was unaware she ever engaged in an activity protected under Title VII.  When asked if Waddell was around when Stinchcomb would send her texts, Capone answered that she "rarely saw [] Waddell" (Ex. A, pp. 225). There is no question that the decision-maker, not the employer in general, must have knowledge regarding the alleged protected activity. *Jackson*, 548 F.3d at 1143; *Cole v. May Dept. Stores*, 109 Fed. Appx. 839, 841 (8th Cir. 2004).

### 4.      No Pretext and Retaliation Not "But For" Cause of Termination

The undisputed evidence also establishes that Waddell articulated a legitimate, non-retaliatory reason for Capone's termination—her continued insubordinate conduct.   Evidence suggesting this reason was a pretext does not exist. Capone had already been involved in an investigation of Hill in June. Her involvement in that investigation without repercussion is undisputed evidence that Waddell possessed no animus against her, or anyone else, for an opposition to harassment.  No disparaging or derogatory comments were made by Waddell either about Capone or her complaints about inappropriate behavior. Capone has not produced evidence that Waddell had a history of interfering with or retaliating against employees who make such complaints.  On at least two occasions, Waddell even encouraged her to call the police when she had issues with other people (Ex. A, pp. 167, 178).  Capone has not identified any witness who will testify that they were terminated by Waddell because they complained about discrimination or harassment (Ex. A, depo. ex. 28—UA 247).  She is "unable provide examples of similarly situated employees, who were treated differently in terms of treatment, discipline, or discharge." *Id*.  Based on these facts, it cannot be reasonably concluded that Waddell terminated her because she complained about harassment.

Unlike discrimination claims, Capone's allegations of retaliation must be the "but for" cause of her termination. *Blomker,* F.3d at 1059.  It is not enough that retaliation was a "substantial" or even "motivating" factor in the decision. *Id.*  Even with the benefit of all facts in her favor, no reasonable jury could conclude that Waddell wanted to punish Capone for complaining to him about her co-workers or an unnamed supervisor, or that she would still be employed "but for" such complaints. According to Capone, she complained in August and was not disciplined or fired. She complained twice in September but was still not terminated. She complained again in October but was still driving buses without reprimand.  As reflected by the

time records and her own entries, it was only after she began repeatedly hanging out in the

maintenance shop while on the clock and beyond her assigned shift, that her supervisors began to

take notice and document.  There can be no material dispute of fact that any similarly, situated bus

driver who reportedly engaged in the same conduct as Capone and to the same extent, would have

been fired by Waddell, too, regardless of whether he or she engaged in a protected activity.


       RESPECTFULLY SUBMITTED,

       By:  /s/ Matt McCoy
       MATT McCOY
       Arkansas Bar No. 2001165
       C. JOSEPH CORDI, JR.
       Arkansas Bar No. 91225
       Associate Generals Counsel
       University of Arkansas
       421 Administration Building
       Fayetteville, AR 72701
       Phone:  479-575-5401
       Email:  mbmccoy@uark.edu
              joecordi@uark.edu

       COUNSEL FOR THE UNIVERSITY


## CERTIFICATE OF SERVICE

       I, Matthew McCoy, Associate General Counsel for the University of Arkansas, do hereby

certify that on this 15th day of February, 2017, I electronically filed the foregoing document using

the CM/ECF System which shall provide service to the following:

       Joshua L. Bailey
       Hogue Law Firm, PLLC
       PO Box 4220
       206 N. College Ave.
       Fayetteville, AR  72702

       /s/       Matt McCoy